# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **PETER KIEWIT SONS' INC. and KIEWIT CORPORATION,** ) ) ) | **CASE NO. 8:08CV541** |
| **Plaintiffs,** ) ) | **SUPPLEMENTAL MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| **v.** ) ) | |
| **ATSER, LP,** ) ) | |
| **Defendant.** ) | |

This matter is before the Court once more on Plaintiffs' Motion for Preliminary Injunction (Filing No. 3), following an evidentiary hearing held on July 6, 2009. Having considered the parties' briefs, evidence, and arguments, the Court concludes that the injunctive relief ordered by the Court in favor of Plaintiffs Peter Kiewit Sons' Inc., and Kiewit Corporation (collectively "Kiewit"), on January 12, 2009, has been satisfied by Defendant ATSER, LP ("ATSER"), and that Kiewit has not met its burden of demonstrating the need for further preliminary injunctive relief. Accordingly, the preliminary injunctive relief granted to Kiewit in the Court's order of January 12, 2009 (Filing No. 31), has expired by the order's own terms and will not be extended, supplemented, or modified.

## FACTUAL BACKGROUND

Kiewit is a large construction, engineering, and mining organization with its headquarters in Omaha, Nebraska. ATSER is an engineering firm located in Houston, Texas, that markets a quality assurance automation software program, Assure-IT™ ("Licensed Software").

On August 20, 2005, Kiewit and ATSER entered into a Software License Agreement (Filing No. 5-4), in which ATSER granted Kiewit a "nonexclusive, nontransferable, fully paid

up and perpetual single service license" to use the Licensed Software.  (*Id*., p. 1[1]). Attached to the Software License Agreement was a proposal from ATSER to Kiewit dated August 19, 2005, regarding an Electronic Quality Management System with a Project Work Plan divided into four major "Phases": (1) set up and implementation, (2) training, (3) maintenance, and (4) data center hosting and technical support.  The proposal stated: "Phase 1 assumes a 30-day implementation period followed by the Phase 2 & 3 Training and Maintenance tasks.  Phase 4 provides three (3) years of Data Center Hosting and Technical Support services by ATSER."  (*Id*., p. 13).

In late December 2008, after the parties spent several months attempting to negotiate a new or continued service agreement, Kiewit asked ATSER to transfer the Licensed Software to Kiewit's own server.  On December 31, 2008, Kiewit initiated this action and filed a Motion for Temporary Restraining Order and Preliminary Injunction (Filing No. 3) seeking to restrain ATSER from disrupting or terminating Kiewit's access to the Licensed Software.  Kiewit contended that ATSER had refused to facilitate the transfer of the Licensed Software to Kiewit's server and had threatened to disrupt or terminate Kiewit's access to the software system.

In determining whether to grant the request for preliminary injunctive relief, the Court considered the factors set forth in *Dataphase Systems, Inc. v. C.L. Sys. Inc.*, 640 F.2d 109 (8th Cir.1981) (*en banc*).  The Court weighed "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Id.* at 114.

The Court found that the balance of the *Dataphase* factors weighed in favor of Kiewit's request for temporary injunctive relief, and ordered that ATSER refrain from

---

[1] Page references are to the CM/ECF pagination of Filing No. 5-4.

disrupting or terminating Kiewit's access to the Licensed Software and facilitate the transfer of the Licensed Software and the accumulated historical data belonging to Kiewit to a server identified by Kiewit, so that it would become a self-hosted program.  The Court specifically declined to order ATSER to transfer to Kiewit or its agents any service codes for which ATSER held copyright or to which ATSER otherwise claimed exclusive ownership.  Finally, the Court acknowledged ATSER's right to compensation for the services it was required to render, and the Magistrate Judge has since been authorized to address the issues related to such compensation.  (Filing No. 59).

The parties have acknowledged that the transfer of the Licensed Software and accumulated historical data is now complete, and Kiewit is self-hosting the program.  Kiewit seeks continuing injunctive relief, however, in the form of (1) perpetual service from ATSER for the Licensed Software at the cost of $6,000 per year, or (2) access to ATSER's source codes for the Licensed Software, directly or through a third-party escrow arrangement.

Kiewit points to certain tables included in ATSER's proposal attached to the Software License Agreement, which tables describe the cost and duration of certain services to be provided by ATSER.  Specifically, "Phase 3: Maintenance" references "Assure - IT Updates for OS Changes" with a duration of "Annual" and a cost of $6,000.  (Filing No. 5-4, p. 13).  Kiewit argues that because the term of its license is "perpetual", and because the term of the Software License Agreement is "perpetuity", and because the table describing "Phase 3: Maintenance" indicates that such maintenance will be "annual" at a cost of $6,000, therefore ATSER has a contractual obligation to provide maintenance

3

support for operating system upgrades[2] in perpetuity at the cost of $6,000 per year. (*Id.*, pp. 1, 2, and 13)

Kiewit argues that if ATSER does not provide such services in perpetuity at the rate of $6,000 per year, then ATSER must provide the source codes for the Licensed Software to Kiewit or to a third party in escrow so that Kiewit or the third party can perform those functions. Kiewit notes that the Software License Agreement includes the following provision: "3.3 <u>Source Code Escrow</u>. Upon request of Customer and at the cost of Customer, the Developer agrees to negotiate and enter into a standard source code escrow agreement with the source code to be held by an independent third party." (*Id.*, p. 2). Kiewit asserts that, if ATSER will not provide maintenance support for operating systems upgrades in perpetuity, Kiewit must have access to the source codes for the Licensed Software in order to correct software "bugs" that are likely to arise, and in order to ensure that the Licensed Software will interface with other software programs as they are revised.

ATSER argues that the reference to future negotiation of a source code agreement simply was intended to protect Kiewit in the event that ATSER was rendered incapable of fulfilling its obligations during the three-year service term under Phase 4 of the Software

---

[2] "Phase 3: Maintenance – ATSER will provide maintenance support for operating system upgrades. Also, ATSER's technical support staff will assist Kiewit [sic] the technical aspects of: site administration, database management, network administration, and advise Kiewit personnel in these routine maintenance functions. . . . Annual maintenance will include OS upgrades to: Microsoft Servers, Oracle, Crystal Reports, and Palm OS releases. State Material Specification updates will performed [sic] on an as needed basis per project. Additional features and changes will be accommodated on a time and material basis." (Filing No. 5-4, p. 12).

License Agreement. ATSER also notes that the Software License Agreement includes the following provision: "Developer does not warrant or represent that the Licensed Software will meet Customer's requirements that the Licensed Software will be error free and . . . the Licensed Software is being provided to Customer 'AS - IS.' If errors are discovered after initial implementation *and while extended support agreement is in place* then the developer will correct at no additional cost to the customer." (*Id.*, p. 4) (emphasis added). ATSER suggests that because Kiewit has no extended support agreement in place, ATSER is under no obligation to facilitate correction of errors in the Licensed Software, let alone modifications to it.

## DISCUSSION

The Software License Agreement is governed by Texas Law. (*Id.*, p. 6). The Texas Supreme Court has held that "an agreement to make a future contract is enforceable only if it is 'specific as to all essential terms, and no terms of the proposed agreement may be left to future negotiations.'" *Fort Worth Independent School Dist. v. City of Fort Worth,* 22 S.W.3d 831, 846 (Tex. 2000) (quoting *Foster v. Wagner*, 343 S.W.2d 914, 920-21 (Tex. Civ. App. 1961). "[W]hen an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." *Id.* (citing *Pine v. Gibraltar Sav. Ass'n*, 519 S.W.2d 238, 244 (Tex. Civ. App. 1974).

Kiewit argues that Texas law recognizes that contracts may be supplemented by trade usage, and that source code escrow agreements are standard in the trade applicable to the dispute at issue. Kiewit acknowledges that the existence of industry-wide usage of trade is a fact question to be determined by the fact finder, and that the burden of proving

5

the existence and scope of the trade usage is on the party asserting its existence. Kiewit suggests that it has met its burden of demonstrating that trade usage requires ATSER to place the Licensed Software source codes in escrow, and that the only term left open for the escrow agreement is the identity of the third party escrow agent.

The Court finds that Kiewit has not demonstrated that it is likely to prevail on the merits of its argument that (1) the License Software Agreement requires ATSER to provide Phase[3] 3 maintenance in perpetuity at the cost of $6,000 per year, or (2) the License Software Agreement mandates that ATSER provide its Licensed Software source codes to Kiewit or place them in escrow with a third party for Kiewit's benefit. Kiewit has demanded a jury trial, and it will certainly have the opportunity to present evidence to persuade the finders of fact that usage of source code escrow agreements in the trade applicable to this dispute should supplement the terms of the License Agreement and mandate ATSER's transfer of the source codes into escrow. The limited evidence before the Court at this preliminary stage of the proceedings does not lead the Court to that conclusion.

Turning to the *Dataphase* factors, Kiewit has not met its burden of demonstrating that additional injunctive relief is warranted to prevent it from suffering irreparable harm; nor that any harm it might suffer absent the injunctive relief outweighs the harm that ATSER would incur if the injunctive relief were granted; nor that the issuance of additional

---

[3] The New Oxford American Dictionary defines "phase" as "a distinct period or stage in a process of change or forming part of something's development." It defines "period" as "a length or portion of time, " and "stage" as "a point, period, or step in a process or development." The term "phase" implies a beginning and an end, rather than state of perpetuity.

injunctive relief is in the public interest. Significantly, Kiewit has not demonstrated a likelihood of success on the merits with respect to its argument that the additional injunctive relief it requests is supported by the terms of the Software License Agreement.

Accordingly,

IT IS ORDERED:

The preliminary injunctive relief granted to Plaintiff Peter Kiewit Sons', Inc. and Kiewit Corporation in the Court's Memorandum and Order of January 12, 2009 (Filing No. 31), has expired by the Order's own terms and no further preliminary relief is ordered.

DATED this 10th day of July, 2009.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge