UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| PETER KIEWIT SONS', INC. and KIEWIT CORPORATION,<br><br>       Plaintiffs/Counter-Defendants,<br><br>v.<br><br>ATSER, LP,<br><br>       Defendant/Counter-Plaintiff. | Case No. 8:08-cv-541<br><br><br><br>**PLAINTIFFS' TRIAL BRIEF** |

**I.     INTRODUCTION**

As this Court is aware, the Software License Agreement at issue in this case bestowed upon Kiewit a "nonexclusive, nontransferable, fully paid up and perpetual singer server license to use object code copies of the Licensed Software and accompanying Documentation." (Trial Ex. 1). The parties have resolved all differences relating to this lawsuit with the exception of the issue whether Kiewit is entitled to maintain its *perpetual* software license through the source code escrow agreement provision and a neutral party. This Brief outlines Kiewit's argument in this regard.

**II.    ARGUMENT**

**A.     Source Code Escrow Agreement**

The purpose of a source code escrow agreement is so well established as to be hornbook law. *See Milgrim's on Licensing*:

> Typically, the software licensor makes available to the license object code (i.e., the program on media with the CPU can interpret) but not the source code (the "higher-level" human-perceptible version) or programming materials needed for modification and enhancement of the program. In anticipation that the licensor may cease maintaining the program (whether by reason or bankruptcy or *simply a decision not to do so*), licensees commonly bargain for escrow arrangements. Under these arrangements the source code together with needed programming

> materials are deposited with a third party (the escrow agent) and are, during the terms of the license, periodically updated.
>
> * * *
>
> [most] "commercial" application software (as opposed to "consumer" mass-marketed software), provide for licensee access to source code under specific circumstances, typically where the licensor no longer offers, *for any reason*, maintenance of the software.

(*Milgrim's,* § 24.14 & n. 83 (emphasis added)).

Kiewit is simply seeking to maintain the operations of the commercial software licensed from ATSER. As in typical commercial software license agreements, Kiewit agreed to a source code escrow in order to maintain its perpetual license in the event that ATSER, for any reason, did not provide the requisite maintenance. Kiewit is seeking to enforce the source code escrow provision so that Kiewit may request maintenance through an independent third party if ATSER refuses to perform same (which is precisely what has transpired in this matter):

> Source Code Escrow. Upon request of Customer and at the cost of Customer, the Developer agrees to negotiate and enter into a standard source code escrow agreement with the source code to be held by an independent third party.

(Trial Ex. 1 at ¶3.3).

ATSER's contrary position is akin to having its cake and eating it too. Specifically, ATSER has argued that it 1) may refuse to continue maintenance **_and_** 2) may refuse Kiewit any alternative even though Kiewit has a perpetual license to the software, and notwithstanding the plain language of the third party escrow provision in the Agreement. There is only one reason for including the source code escrow provision—if ATSER, for any reason, cannot or will not provide maintenance so as to keep the perpetual license operational, then Kiewit is entitled to realize the benefit of its bargain by contracting with a non-party software maintenance engineer to provide the necessary maintenance, as that term is also defined by the parties' Agreement.

Instead of conceding the purpose of the escrow requirement, ATSER deflects by attempting to mislead the Court by suggesting that ¶3.3 is nothing more than an "agreement to agree," *i.e.,* an unenforceable provision. This is simply not the case. In fact, it is ATSER who agreed to place the source code into escrow, and any contract to do so will be entered by and between ATSER and the independent third party, with Kiewit named as a beneficiary. We know that ATSER has honored an identical provision in a nearly-identical Software License Agreement. (Trial Ex. 8).

ATSER's obligation to place the source code in escrow for Kiewit's benefit is enforceable by this Court:

> Where the parties have completed their negotiations of what they regard as essential elements, and performance has begun on the good faith understanding that agreement on the unsettled matters will follow, the court will find and enforce a contract even though the parties have expressly left these other elements for future negotiation and agreement, if some objective method of determination is available, independent of either party's mere wish or desire. Such objective criteria may be found in the agreement itself, commercial practice or other usage and custom. If the contract can be rendered certain and complete, by reference to something certain, the court will fill in the gaps (*see* Restatement 2d, Contracts, § 230, esp. Comment D; § 247; 1 Corbin, Contracts, § 95, pp. 401—404).

*Metro-Goldwyn-Mayer, Inc. v. Scheider,* 392 N.Y.S.2d 252, 253 (N.Y. 1976). "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204. Texas courts routinely supply such missing terms:

> When a contract is silent on an issue, Texas courts will infer reasonable terms. *See* [*Medical Towers, Ltd. v. St. Luke's Episcopal Hosp.,* 759 S.W.2d 820, 822-24 (Tex. Ct. App. 1988] (concluding lease agreement silent as to method of appraisal required; and inferring comparable sales approach the proper method for determining value of property using accepted rules of construction.[FN2] Texas courts will also supply missing terms when necessary to effectuate the purposes of

the parties under the agreement. *O'Farrill v. Gonzalez,* 974 S.W.2d 237, 244 (Tex. Ct. App 1998); *see also* Restatement (Second) of Contracts § 204 cmt. d (1981).

[FN2]*See also Thompson v. CPN Partners, L.P.,* 23 S.W.2d 64, 72 (Tex. Ct. App. 2000) (concluding security contract silent on issue of which areas of shopping center to be patrolled; and interpreting security contract as arranging for guards to patrol common areas of center, not inside leased premises); *Embrey v. Royal Indem. Co.,* 986 S.W.2d 729, 733 (Tex. Ct. App. 1999) (concluding insurance policy supplementary payments provision silent on payment of prejudgment interest; and inferring provision did not require insurance company to pay such interest in excess of policy limits), *aff'd,* 22 S.W.3d 414 (Tex. 2000); *Maxwell v. Lake,* 674 S.W.2d 795, 802-03 (Tex. Ct. App. 1984) (concluding contract silent on method of exercising option; and therefore inferring option could be exercised by giving notice within option period and tendering performance within a reasonable time thereafter); *Price v. Horace Mann Life Ins. Co.,* 590 S.W.2d 644, 646 (Tex. Ct. App. 1979) (concluding contract silent regarding time within which insurer might require application for reinstatement; and inferring parties intended a reasonable time).

*Lidawi v. Progressive County Mut. Ins. Co.,* 112 S.W.3d 725, 731-32 & n.2 (Tex. Ct. App. 2003).

There are numerous objective criteria present in this case to render the agreement certain and complete. First, it is undisputed that the perpetual License Agreement requires ATSER to enter into an escrow agreement upon Kiewit's request, and that Kiewit so requested. Second, Kiewit employee Tom Harter testified that usage of such a contractual provision is custom, and that the escrow is not typically established at the beginning of the parties' relationship, but is usually set up when a problem later arises (such as has occurred here). (ECF 154, July 6, 2009 H'g Tr. at 56:13-62:11). Third, ATSER has entered a source code escrow agreement since this lawsuit was filed:

> Q. Is there an escrow agreement associated with that license?
>
> ***
>
> A. Yes.

Q. Yes, there is an escrow agreement?

A. Yes

\*\*\*

Q.  . . . What I'm asking is was there consideration given dollar-wise for the creation of that escrow agreement?

A. Yes.

Q. What was that?

A. I don't know what that was, but there was consideration.

Q. There was a dollar amount paid to ATSER for creation of that escrow?

A. Yes, they had—they pay a yearly annual fee for the escrow agreement.

\*\*\*

Q. Real roughly, do you remember how much that was?

A. Around [$]5,000 annually.

\*\*\*

Q.  Real briefly, I didn't ask this very well before, so I apologize, but the escrow agreement, the $5,000, that's an amount paid by Harris County to – is it to, is it to ATSER or is it to the escrow agent, do you know?

A.  The way it's set up it's paid to ATSER and it's a pass-through and we pay the escrow company for it.

\*\*\*

Q. And who is that agent?

A. Escrow Tech. . . .they're out of Utah.

Q.  …Did ATSER provide the Assure-IT 11.0 to the escrow agent in source code form or object code form?

A. Source code.

(ECF 289, Ex. 1, 3/1/2010 ATSER 30(b)(6) Dep. Tr. at 17:20-20:7; 21:21-22:17).

Significantly, ATSER's refusal to enter the source code escrow agreement for Kiewit's benefit is of recent vintage. During ATSER principal Fred Martinez' deposition on June 16, 2009, Mr. Martinez did not indicate that the source code provision was unenforceable or that he was unwilling to live up to his contractual obligations:

Q. (BY MR. PETERSON) Why don't we look at 3.3 of Exhibit 11.

A. 3.3 of Exhibit 11?

Q. Do you have it in front of you?

A. Yes, sir.

Q. It reads source code escrow. Do you see that?

A. Yes, sir.

Q. "Upon request of customer and at the cost of customer, the developer agrees to negotiate and enter into a standard source code escrow agreement with the source code to be held by an independent third party." Do you see that?

A. Yes, sir.

Q. Have you done that?

A. No, sir.

Q. Kiewit's asked you to enter into -- into a source code escrow agreement. Have they not?

A. On December -- 12 days before the end of 2008? We've been a little busy with Kiewit.

* * *

Q. But as we talked about before, there is a provision specifically in the agreement between ATSER and Kiewit that the source code would be put into an escrow agreement at the request -- upon the request of Kiewit. Correct?

MR. BAUSCH: Objection. I'm sorry. Objection to form.

A. Yes, if we have a reasonable time. Not with 12 days left before the end of the year.

> Q.  (BY MR. PETERSON) Understood.  But that – even if that request was made 12 days before the expiration, any reason why it hasn't -- the source code hasn't been put into an escrow pursuant to a standard source code escrow agreement?
>
> A.  Well, we took on, if you can imagine, a Herculean effort to get the -- what Kiewit requested, is Kiewit self-hosting capabilities.  So we've been a little busy.
>
> Q.  Well, let me ask you this:  Do you have any issue with putting the source code into a source code escrow agreement for the Assure-IT program?
>
> MR. BAUSCH:  I object to the form of the question.
>
> A.  No, sir.

(Martinez Dep. at 175:15-176:8; 229:4-230:4).  As Mr. Martinez testified, he found "no problem" with transferring the source code to an escrow agreement, but offered the excuse that ATSER had been a "little busy."  Certainly, ATSER's recent decision to now refuse to comply with this contractual provision is inconsistent, improper, and subject to remedy by this Court.

As noted, Kiewit is simply seeking to enjoy the benefit of its bargain, *i.e.*, the perpetual software license.  Kiewit is not asking for subsequent iterations or versions of the Assure-IT software, but only the right to use and maintain the software it acquired under the Agreement.  ATSER's contrary position is untenable, and constitutes an unreasonable, selfish, and unsupported interpretation of the parties' Agreement.  Kiewit should not be forced into no choice at all, but should be allowed to maintain the software as the Agreement and the industry anticipated it would, by entering into a source code escrow agreement. [1]

As for the specific terms to be included within the agreement, standard provisions are demonstrated in Kiewit's Trial Exhibits 92-97.  ATSER's escrow agent, EscrowTech, provides a comprehensive white paper at its website, www.escrowtech.com, which was filed previously

---

[1] Kiewit has gone a step further to assuage ATSER's fears, and is willing to pay a neutral non-party to access the source code to maintain the Assure-IT program.

with the Court. (ECF 289, Ex. 2, EscrowTech White Paper [Trial Ex. 95]). EscrowTech's fee schedule was also previously filed. (ECF 289, Ex. 3, EscrowTech Fee Schedule [Trial Ex. 96]).

### III.   TRADE USAGE

ATSER asserts that Kiewit should not be allowed to rely upon Mr. Harter's testimony because he was not designated as an expert. There is no legal support for ATSER's position. ATSER cites *XCO Prod. Co. v. Jamison,* 194 S.W.3d 622 (Tex. Ct. App. 2006), for the proposition that, "Texas law provides for two methods of establishing trade usage, expert testimony and reference material." (ECF 259 at 9). This is a misquote of the *XCO* case, which explained how a court "may" resolve an ambiguity in a contract:

> In determining whether a contract is ambiguous, we look to the contract as a whole, in light of the circumstances present when the contract was executed. *Sun Oil Co. (Del.) v. Madeley,* 626 S.W.2d 726, 731 (Tex. 1981); *Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc.,* 56 S.W.3d 313, 319 (Tex. App.— Houston [1st Dist.] 2001, pet. denied); *see also Hewlett-Packard,* 142 S.W.3d at 561 ("We construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served."). These circumstances include the commonly understood meaning in the industry of a specialized term, *which may be proven by extrinsic evidence* such as expert testimony or reference material. *See Mescalero,* 56 S.W.3d at 320, 323; *Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc.* 157 S.W.3d 462, 465 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

*XCO Prod. Co. v. Jamison,* 194 S.W.3d 622, 627-28 (Tex. Ct. App. 2006) (emphasis added). Texas Courts rely on a laundry list of extrinsic evidence to resolve ambiguity in a contract, and certainly do not limit the inquiry to information disclosed by experts. *See, e.g., Barry v. Liddle, O'Connor, Finkelstein & Robinson*, 98 F.3d 36, 40 (2nd Cir. 1996) (listing available extrinsic evidence to include an event, a commercial practice, or trade usage). Regardless, there is no allegation of ambiguity, but rather missing terms relating to the promised source code escrow agreement—they are not the same thing. "Ambiguity in contract language . . . is not to be

confused with silence. . . .   When a contract is silent on an issue, Texas courts will infer reasonable terms." *Lidawi,* 112 S.W.3d at 731 (citations omitted).

The concept of a source code escrow agreement is easily explained by Mr. Harter and in EscrowTech's reference material (white paper) and does not require scientific, technical, or specialized (expert) knowledge.  Mr. Harter's testimony is proper under rule 701:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

ATSER relies on Milgrim's discussion of whether and to what extent actual copyright ownership may be transferred in an escrow arrangement for the proposition that there may be more than one type of standard escrow agreement.  (ECF 259 at 11).   This is a red herring argument, as there is no such issue between the instant parties.

Kiewit is entitled to have ATSER comply with its unequivocal promise to establish a source code escrow agreement.  The Court can define reasonable terms upon which the agreement will operate, as set forth in the law and as defined by the evidence adduced herein, to protect both ATSER and Kiewit.  In this particular situation, a neutral, non-party software technician engineer would provide the necessary maintenance to keep the Assure-IT program operational, including fixing bugs and adding state specifications, etc., and as "Maintenance" is defined in the Agreement.

DATED this 7th day of April, 2010.

                    Respectfully submitted,

                    PETER KIEWIT SONS', INC. and
                    KIEWIT CORPORATION,
                    Plaintiffs/Counter-Defendants,

                    By: s/ ***Nora M. Kane***
                        Mark J. Peterson, #18850
                        Nora M. Kane, #21562
                        STINSON MORRISON HECKER LLP
                        1299 Farnam Street, 15th Floor
                        Omaha, Nebraska  68102-1818
                        Phone:  (402) 342-1700
                        Fax:     (402) 930-1701
                        mpeterson@stinson.com
                        nkane@stinson.com

                    ATTORNEYS FOR
                    PLAINTIFFS/COUNTER-DEFENDANTS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 7th day of April, 2010, I electronically filed the foregoing Plaintiffs' Trial Brief using the CM/ECF System which sent notice of such filing to the following:

    Megan Sebastian Wright - mwright@clinewilliams.com
    Trenten P. Bausch - tbausch@clinewilliams.com
    Richard P. Jeffries - rickjeffries@clinewilliams.com
    Theresa D. Koller – tkoller@clinewilliams.com
    Cline, Williams, Wright, Johnson & Oldfather, L.L.P.
    One Pacific Place
    1125 S. 103rd Street, Suite 600
    Omaha, NE  68124

                        s/ ***Nora M. Kane***
                        Nora M. Kane